The undersigned has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Chapman, and has reviewed the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award.
******************
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
STIPULATIONS
1. (Both cases) At the time of the alleged injury by accident or occupational disease the parties were subject to and bound by the provisions of the Workers' Compensation Act.
2. (Both cases) Fieldcrest Cannon was a self-insured employer.
3. (I.C. 429532) The employer-employee relationship existed between defendant-employer and plaintiff.
4. (I.C. 429532) Plaintiff's average weekly wage was $332.19.
5. (I.C. 429532) The date of the alleged injury was November 1, 1993.
6. Plaintiff's last date of work for defendant was April 22, 1994.
In addition, the parties stipulated into evidence medical records and reports from Orthopedic Group of Concord, Dr. Correll and Cabarrus Memorial Hospital totalling twenty-one pages.
******************
The Full Commission adopts the findings of fact found by the Deputy Commissioner as follows:
FINDINGS OF FACT
1. As of November, 1993, plaintiff was thirty-one years old and he had been employed by defendant for approximately five years. His job at that time was as a helper in the sheet distribution department, and his duties primarily involved using a forklift to transport pallets loaded with boxes or sheets. He had worked in this capacity for several years.
2. On November 1, 1993 plaintiff was driving a forklift on the second floor of the sheet distribution area. He climbed down from the forklift in order to wrap stretch plastic around a loaded pallet to secure the load. As he was wrapping the plastic around the boxes, the plastic snapped and he fell backwards, landing on his buttocks. However, he got up and continued working. When he got to the bottom of the pallet, he experienced a ripping sensation in his low back and then severe pain. He then reported his injury and went to the company's medical department where he was seen by a nurse.
3. The company nurse treated plaintiff with ice and medication. Despite continuing pain, he reported to the plant the next day and did do some work before returning to the medical department where he received heat treatment for his back pain. His condition improved and he was able to continue working thereafter. However, for an unknown period of time, he was allowed to drive the forklift without having to get off of it. He testified that he continued to complain of back pain thereafter, but he did not tell Larry Tucker, the assistant department manager, of any problems and he did not appear to be having problems at work. On December 4, 1993 when he was seen at the emergency room, he described upper back pain, not low back pain, and he was diagnosed with an epigastric problem.
4. Plaintiff did not obtain medical treatment for low back symptoms until February 23, 1994 when he saw Dr. Correll, his family doctor, for pain in his sacroiliac joints. He advised Dr. Correll that he may have hurt himself at the mill but that he was not sure. Dr. Correll treated him for a lumbrosacral strain. At that time plaintiff was also experiencing significant symptoms of anxiety due to a conditions discussed subsequently, and Dr. Correll was treating him for that condition, as well.
5. On March 24, 1994 plaintiff went to the emergency room with complaints of low back pain which he indicated had been present since he hurt himself the previous November. His condition was diagnosed as a lumbosacral strain and he was treated conservatively. He was also referred to Dr. Hendricks who saw him on March 31. Dr. Hendricks prescribed medication and physical therapy and gave him a fifteen-pound lifting restriction for two weeks. Dr. Hendricks examined him again on June 2, 1994 and released him from care with home exercises to perform. The next time plaintiff reported back problems was in October 1994 when he was hospitalized for his anxiety disorder. The treating psychiatrist referred him for physical therapy. No other treatment was documented in the record after that month.
6. On November 1, 1993 plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant. The fact that he fell when the plastic wrap broke was an unusual occurrence which interrupted his regular work routine. The fact that he subsequently bent over to pull the wrap around the bottom of the loaded pallet constituted a specific traumatic incident of the work assigned. He suffered a back injury as a result of these incidents. However, he apparently recovered from the incident with treatment at the medical department of the plant. In that he did not complain of further problems until February 23, 1994 when he saw Dr. Correll, in that he had seen Dr. Correll in January without mentioning a back problem, in that he was not sure whether his condition was due to an injury at work when he spoke to Dr. Correll in February, and in that no medical causation testimony was offered, the back problems for which he was treated in February and March 1994 and in October 1994 were not proven to be a proximate result of the November 1, 1993 injury.
7. Plaintiff was not rendered disabled as a result of his back injury on November 1, 1993 except for the day of injury and the next day when there were times he was unable to perform his job duties. However, the evidence indicated that he continued to receive his regular wages during those times since he was at the mill during his scheduled work hours. He also sustained no permanent partial disability as a result of the injury.
8. Plaintiff has also claimed worker's compensation benefits for an anxiety disorder which he has alleged arose from his employment. Before he began working for the company, he had had some psychological problems. He had apparently taken an overdose when he was seventeen, and Dr. Correll had referred him to Mental Health in February 1985 for "nerves."
9. In 1989 Sam Allman, a security coordinator at the mill, approached plaintiff to ask if he would like to make some extra money on the side and told him that if he would give his social security number checks would be given to him to cash He would be allowed to keep ten percent of the money but would give the rest back to Dr. Allman. Despite the suspicious circumstances, plaintiff agreed to the plan without questioning what the checks were for or finding out why he was to receive them. Consequently, he was unaware that some of the employees of the mill had entered into an agreement with the company where they would perform odd jobs during non-working hours which would otherwise have been contracted out to other companies. The jobs included cleaning under the mill and disposing of or salvaging items no longer needed by the company. An invoice was submitted in plaintiff's name for the work done so the check for payment was made payable to plaintiff. Consequently, the money was not reported for tax purposes to anyone actually doing the work. They were paid in cash after plaintiff gave ninety percent of the money to Mr. Allman.
10. Not knowing why he was getting the checks, plaintiff eventually began to get worried. Some of the checks were for substantial sums and were from other companies besides defendant. He also became aware that items were being taken from the plant by some of the employees involved. He then began to ask some questions but was not given an explanation. Comments made by Mr. Allman caused plaintiff to feel threatened so he became even more anxious. In July 1991 he went to Dr. Correll complaining of flushing easily and tingling and pressure in his head which he wondered could be due to stress. He reported that his girlfriend was pregnant and was having difficulties with the pregnancy and that they were having financial problems. In August 1992 he was seen in the emergency room for complaints of feeling like he was going to pass out. He complained of chest pain in March 1993, and in October 1993 he returned to Dr. Correll with episodes where he thought he might faint. Two months later he was seen in the emergency room for chest and upper back pain. The emergency room physician diagnosed anxiety and epigastric pain at that time. Plaintiff returned to Dr. Correll on January 6, 1994 and tried to explain about the money laundering scheme. He indicated that he passed out at work. At this point Dr. Correll diagnosed him with anxiety and prescribed medication for that condition.
11. In the summer of 1993, plaintiff spoke to some people at the plant about what had been going on with Mr. Allman and a meeting was then arranged with Cecil Yates, defendant's director of security. After the conversation, Mr. Yates conducted an investigation and learned that most of the checks plaintiff had received were for projects which had been authorized by the company and for which work had been performed, and that the items taken from the mill were scrap which defendant wanted removed. The only problem was that plaintiff had been paid for the work, even though he had not had anything to do with it, and no income had been reported to the Internal Revenue Service for those who had done the work. In fact, the mill had neglected to file Form 1099's at all for the work performed from 1989 through 1992. Consequently, in March 1994 after the investigation was completed, Form 1099's were filed by defendant with the Internal Revenue Service showing amounts paid to plaintiff for those years.
12. Plaintiff then began to have increasing symptoms of anxiety. He complained of abdominal pain and by July 1994 was having symptoms of anxiety attacks. His condition was further complicated by the birth of his second child and by his termination by the company for excessive absenteeism. He was seen in the emergency room four times in less than two months. On August 22, 1994 Dr. Correll decided that he was having panic attacks and referred him to Mental Health in addition to prescribing anti-anxiety medication. However, plaintiff's condition worsened and October 7, 1994 he admitted himself to Rowan Memorial Hospital's psychiatric ward where he came under the care of Dr. Rosado, a psychiatrist. Dr. Rosado diagnosed his condition as a panic disorder and changed his medication. His symptoms slowly improved until he was discharged on October 20, 1994. Thereafter, he received treatment at Mental Health, but most of the nature of that treatment was not revealed by the evidence.
13. Plaintiff did develop a panic disorder. The tax evasion scheme in which he became involved was a significant stressor and was one of the precipitating factors in his psychological condition. However, the scheme was not related to his employment with defendant. Sam Allman was not plaintiff's supervisor. In any event, there was no representation to plaintiff that the payments were work related. Rather, Mr. Allman said that they were from a "business venture." Furthermore, it was obvious that, whatever the checks plaintiff received were for, they were not wages for the work he was doing for the company. They were written by the accounts receivable department and not by the payroll department, and he was otherwise getting his normal wage payments from the company during that time. He had no reason to believe anything other than that the payments related to some activity outside of his job duties.
14. The company knew nothing of the scheme until 1993. It was simply paying for work being done at the plant by people who were otherwise employees but who had contracted to do certain dirty jobs outside of their employment during weekends and off hours. There was no contact between plaintiff and the personnel of defendant who were responsible for contracting the work to be done. Sam Allman apparently did the negotiating for the group involved. Presumably, he indicated that plaintiff was one of the members of the group which was why payment was to be made to him.
15. Plaintiff's employment as a helper in the sheet distribution department did not place him at an increased risk of developing a panic disorder as compared to the general public not so employed. Furthermore, his job duties and the conditions of his employment were not a significant contributing factor in the development of that condition. In fact, there was no indication that his job had anything to do with that condition.
16. Plaintiff's panic disorder was not proven to have been an occupational disease which was due to causes and conditions characteristic of and peculiar to his employment with defendant and which excluded all ordinary diseases of life to which the general public was equally exposed.
******************
Based upon the findings of fact, The Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. (I.C. 554835) On November 1, 1993 plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant in that he sustained a back injury as the result of a specific traumatic incident of the work assigned. G.S. Section 97-2 (6).
2. (I.C. 554835) In that plaintiff did not prove that he sustained disability or required medical treatment outside of defendant's medical department as a result of the injury, he is not entitled to benefits under the Workers' Compensation Act for the injury. G.S. Section 97-2 et seq.
3. (I.C. 429532) Plaintiff's panic disorder was not an occupational disease which was due to causes and conditions characteristic of and peculiar to his employment with defendant-employer and which excluded all ordinary diseases of life to which the general public was equally exposed. G.S. Section 97-53 (13); Booker v. Duke Medical Center, 297 N.C. 458
(1979).
4. (I.C. 429532) Plaintiff is not entitled to benefits under the Workers' Compensation Act for his panic disorder. G.S. Section 97-2 et seq.
******************
Based on the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
AWARD
1. (I.C. 554835) Plaintiff's claim for workers' compensation benefits for his back injury is hereby DENIED.
2. (I.C. 439532) Plaintiff's claim for workers' compensation benefits for his panic disorder is hereby DENIED.
3. Each side shall pay its own costs.
This the sixteenth day of July, 1997.
 S/ ______________________ W. BAIN JONES, JR. DEPUTY COMMISSIONER
CONCURRING:
S/ ______________________ LAURA K. MAVRETIC COMMISSIONER
S/ ______________________ THERESA B. STEPHENSON DEPUTY COMMISSIONER
WBJjr:crj